FIRST INSURANCE COMPANY OF HAWAII, LTD., Plaintiff, *v.* INTERNATIONAL HARVESTER COMPANY, a Delaware corporation, Defendant, HARTFORD INSURANCE GROUP, Plaintiff-Appellee, *v.* INTERNATIONAL HARVESTER COMPANY, Defendant, and CITY AND COUNTY OF HONOLULU, Defendant-Appellant, Third-Party Plaintiff, *v.* OAHU TURF & SPRINKLER CO., INC., IAN TEKARE, Administrator of the Estate of ANTHONY TEKARE, ERLING W. HEDEMANN, LONNIE WILLIAMS, KOOLAU NURSERY & LANDSCAPING CO., EILEEN KENNEY, Administratrix of the Estate of GEORGE S. KENNEY, Third-Party Defendants

NO. 6786

(CIVIL NOS. 41932 & 42233)

FEBRUARY 15, 1983

NAKAMURA, J., RETIRED JUSTICES
OGATA AND MENOR ASSIGNED TEMPORARILY,
AND CIRCUIT JUDGE ACOBA, IN PLACE OF
LUM, J., DISQUALIFIED*

---

* Chief Justice Richardson, who heard oral argument in this case, retired from the court on December 30, 1982. HRS § 602-10 (1979 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

*Per Curiam.* Defendant-appellant City and County of Honolulu (the City) appeals from a judgment holding it liable for part of the sums paid by Plaintiff-appellee Hartford Insurance Group (Hartford) in settlement of the tort suits brought against its insured, Hawaiian Equipment Company (Hawaiian Equipment), as a consequence of a fatal highway crash involving a rig composed of a truck owned by Oahu Turf and Sprinkler Company (Oahu Turf) and a trailer owned by Hawaiian Equipment. The primary question posed for decision is whether the City should be responsible in part for damages flowing from an accident where the City's negligence in licensing the driver of the truck was found by the jury to be a causative factor. We agree with the circuit court that in this case the City's conduct rendered the judgment against it for part of the sums previously paid by Hartford a proper one, and we affirm the judgment.

### I.

The fatal mishap occurred on August 3, 1971 while Anthony Tekare, a truck driver employed by Oahu Turf, was operating the heavy truck and trailer combination on Likelike Highway and proceeding toward Honolulu. Shortly after he had traversed the Koolau mountain range through the Wilson Tunnel, the brakes on the rig apparently failed. The driver was unable to bring the truck and trailer to a stop, and they sped out of control down the highway and crashed into an automobile being driven by Frances Thomas. Six persons, including Tekare and Frances Thomas, were killed and two others suffered serious injuries as a result of the collision. The fatalities included two passengers in Frances Thomas' vehicle and two pedestrians.

The ill-fated truck owned by Oahu Turf had been manufactured by International Harvester Company (Harvester); the trailer was owned by Hawaiian Equipment but leased to Oahu Turf. When the accident happened, the truck and trailer were being used to haul material for the Koolau Nursery under an agreement between the nursery and Oahu Turf.

The calamitous accident caused a number of lawsuits to be brought against the owners of the truck and trailer. Hartford settled the claims for damages against Hawaiian Equipment and thereafter sought contribution from Harvester and the City for the amounts expended in the settlement. The contribution suits were tried before a jury in the First Circuit Court and a verdict finding the City responsible for fifty percent of such expenditures was returned. The circuit court entered judgment against the City in accord with the verdict, and the City subsequently perfected a timely appeal to this court.[1] Though the City has raised several issues, the principal question on appeal, as we noted, is whether the City should be liable for damages flowing from its negligence in the licensing of the truck driver.

## II.

### A.

The watershed decision in Hawaii on municipal tort liability for negligence in the performance of public functions was *Kamau v. Hawaii County,* 41 Haw. 527 (1957). Like most American jurisdictions, we earlier followed "the so-called 'rule' that the municipality . . . [was] liable for torts committed by its agents in the performance of its private or proprietary functions but . . . [was] not responsible for torts committed in the performance of governmental functions." *Id.* at 530. But in *Kamau* our Territorial predecessors acknowledged the cases applying the foregoing "rule" were "in hopeless confusion" and "impossible to reconcile," *id.* at 531, and after reexamining the "rule" proclaimed

> that the narrow rule heretofore followed as to so-called "governmental" or public functions and "proprietary" or

---

[1] Hartford paid $110,230.69 in settlement of claims arising out of the August 3, 1971 accident on behalf of its insured. The total paid out in settlement of claims arising out of the accident by the insurers involved was approximately $380,000. The jury verdict of July 15, 1977 found the City liable for fifty percent ($55,115.35) of the amounts paid by Hartford.

private functions should not control the question of municipal liability for its torts; that where its agents are negligent in the performance of their duties so that damage results to an individual, it is immaterial that the duty being performed is a public one from which the municipality derives no profit or that it is a duty imposed upon it by the legislature.

*Id.* at 552. "The basic . . . [principle] of governmental tort liability in Hawaii [now] is that the State and its political subdivisions shall be held accountable for the torts of governmental employees ' . . . in the same manner and to the same extent as a private individual under like circumstances . . . ' HRS § 662-2." *Salavea v. City & County,* 55 Haw. 216, 220, 517 P.2d 51, 54 (1973).[2]

Hartford's claim against the City is one for contribution; it rests on the City's alleged negligence in issuing a motor vehicle operator's license. Fundamental in any determination of liability for negligence is "the existence of a duty owed by the . . . [putative tortfeasor] to the . . . [injured person]." *Namauu v. City & County,* 62 Haw. 358, 361, 614 P.2d 943, 945 (1980). However, "it should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." W. Prosser, *Handbook of the Law of Torts* § 53, at 325-26 (4th ed. 1971). Our initial task then is to weigh the considerations supporting recovery by the injured person against those favoring a limitation of the City's liability to determine whether there was a duty owed by the City to those who suffered injury in the highway crash. *Kelley v. Kokua Sales & Supply, Ltd.,* 56 Haw. 204, 207, 532 P.2d 673, 675 (1975).

---

[2] This statement of course does not apply to those actions exempted from coverage under the State Tort Liability Act, HRS Chapter 662. The Act, however, has limited application where the City is concerned. *See* Orso v. City & County, 56 Haw. 241, 246-47, 534 P.2d 489, 492-93 (1975).

B.

A very substantial public interest in highway safety compels the licensing of motor vehicle operators. In Hawaii, the authority "to examine into the qualifications and fitness of any person desiring to secure . . . a license to operate a motor vehicle" has been delegated to the counties. HRS § 286-101.[3] The licensing of an operator, however, does not render the City a guarantor of his competence, for it obviously can do no more than test a person's minimal competence to drive a motor vehicle. *See Pickering v. State,* 57 Haw. 405, 409, 557 P.2d 125, 128 (1976). And when reasonable procedures adopted to examine the relevant qualifications and fitness are followed, there would be no reason for predicating liability on the issuance of a driver's license.[4] Otherwise, the City may be saddled with an impossible burden in the exercise of the delegated function. But we do not suggest the City should be free of liability under all circumstances. *See Restatement (Second) of Torts* § 288C comment a (1965); *see also Jones v. Hittle Service, Inc.,* 219 Kan. 627, 631-32, 549 P.2d 1383, 1389 (1976).

Here, the circumstances were such that a breach of duty could be premised on the City's authorization of Anthony Tekare's presence behind the steering wheel of the truck-trailer combination that "barreled" down the Likelike Highway with catastrophic consequences. Since his operation of the rig was authorized, there was an implication that his fitness to do so

---

[3] HRS § 286-101 provides:

The chief executive of each county shall designate one or more persons, residing in the county, each of whom shall be a competent operator of motor vehicles, to be known as the examiner of drivers, and whose duty it shall be to examine into the qualifications and fitness of any person desiring to secure or to renew a license to operate a motor vehicle as provided in this part.

[4] We are also mindful of those cases holding "that when State officials negligently issue a license or fail to revoke it, the State action is generally held not to be the proximate cause of the injury inflicted by the licensee." Southworth v. State, 47 N.Y.2d 874, 876, 419 N.Y.S.2d 71, 72 (1979); *see also* Annot., 79 A.L.R. 3d 955 (1977) and the cases cited therein.

had been examined and determined. *See* HRS § 286-102.[5] Yet the record discloses no examination was conducted to test even his minimal competence to drive the rig on a public highway without endangering the motoring public and pedestrians. Tekare was licensed a day or so before the accident on the strength of a single letter stating he had been found qualified to drive truck-trailer combinations by someone competent to examine applicants for licenses. The purported examiner, however, was not authorized to certify the qualifications and fitness of an applicant for a "Category 7" license. Moreover, a deposition of the "examiner" which was received in evidence at trial reveals he denied ever having evaluated Anthony Tekare's competence as a driver.

The licensing procedures in effect during the relevant period called for the issuance of an instruction permit when application for a "Category 7" license was made. The applicant would only be issued a license after his qualifications and fitness to operate the vehicles in this category were certified by someone competent to make such judgments. It was, of course,

---

[5] In 1971 when Tekare was licensed to operate a truck-trailer combination, HRS § 286-102 required that persons operating motor vehicles should be examined as provided in HRS § 286-108 (1968), which read:

The examiner of chauffeurs shall examine every applicant for an operator's or chauffeur's license, except as otherwise provided in this part. The examination shall be held in the county where the applicant resides within ten days from the date of the filing of the application. It shall include a test of the applicant's eyesight and such further physical and mental examination as the examiner of chauffeurs finds necessary to determine the applicant's fitness to operate a motor vehicle safely upon the highways; the applicant's ability to understand highway signs regulating, warning, and directing traffic; his knowledge of the traffic laws of the State and the traffic regulations of the county where he resides or where he intends to operate a motor vehicle; and actual demonstration of ability to exercise ordinary and reasonable control in the operation of a motor vehicle. *The examinations shall be appropriate to the operation of the category of motor vehicle for which the applicant seeks to be licensed and shall be conducted as required by the state highway safety coordinator.*

(Emphasis added).

Tekare sought and obtained a Category 7 license, which deemed him qualified to operate passenger cars, light and heavy trucks, buses, as well as truck-trailer combinations. *See* HRS § 286-102 (1968).

expected that the necessary certification would be preceded by testing. In Tekare's case no certification of the applicant's competence, as prescribed by the City's own procedures, was ever presented. Nevertheless, his operation of a potentially lethal instrumentality on the public highways was sanctioned.

We think there was a duty owed by the City to the motoring public and pedestrians not to validate a truck-trailer driver's presence on the highways without an examination of his competence. And as the City's egregious conduct enhanced the possibility of harm befalling the victims of the accident, there was negligence that could give rise to recovery. *Cf. Oleszczuk v. State,* 124 Ariz. 373, 376-77, 604 P.2d 637, 640-41 (1979) (as a statutory duty becomes more specific and narrow, it becomes more likely that the duty has been narrowed to one owed an individual).

### III.

Having concluded there was a legal basis for the judgment in Hartford's favor, we proceed to the assertions that the circuit court erred in rejecting some of the expert testimony offered by the City. From our review of the record, we are convinced there was no prejudicial error in the rulings.

### A.

The City's initial claim of error in the evidentiary rulings is related to the proffer of the deposition testimony of Derwyn M. Severy, who had initially been listed as Hartford's expert, as evidence at trial. While much of his deposition testimony was read to the jury, the trial court did not allow the reading of portions dealing with a "belt disruption monitor system" which allegedly would have apprised the driver of the fatal rig that there was insufficient air for the air brakes to function, if such a system had been installed in the truck and trailer. The City maintains the accident could have been avoided by these means and the evidence was therefore relevant.

Severy, however, acknowledged the system was not "in common use in the manufacture of motor vehicles"; he also had no knowledge of whether such systems were actually in

use. We find no abuse of discretion in the trial court's rejection of the foregoing evidence on grounds that a proper foundation for its introduction was lacking. *See Friedrich v. Department of Transportation,* 60 Haw. 32, 38, 586 P.2d 1037, 1041 (1978).

### B.

The rejection of parts of the deposition testimony of a second "expert" who had been designated by Hartford as a prospective witness, Tolerton Vaughn, is next raised as error by the City. The disallowed portions consisted of testimony on "how a human error in handling the air brakes of the truck could not have caused a loss of air sufficient to result in a negative effect on the braking of the truck."

This line of evidence presupposed a braking system that was operational. But the record indicates the brakes on the rig probably failed shortly after its emergence from the Wilson Tunnel. We could not deem as error the ruling by the trial court that testimony of questionable relevance ought not be read to the jury.

### C.

The City's final claim of error covers the trial court's decision not to allow the reading of those pages of the deposition "where Mr. Vaughn rendered his opinion that the accident would not have occurred had the emergency relay valve been operating." Hartford's objection to the testimony was that it was speculative and based on hearsay. We would have to agree the testimony was speculative; it also gave an appearance of invading the jury's province. *See Friedrich v. Department of Transportation, supra; Bachran v. Morishige,* 52 Haw. 61, 67, 469 P.2d 808, 812 (1970). Again, we see no reason to hold there was an abuse of discretion.

And from our review of the record, we conclude the judgment is sustained by the evidence.

Affirmed.

*Francis Nakamoto* (*Charles A. Viviano* on the briefs), Deputies Corporation Counsel, for defendant-appellant.

*Dennis E. W. O'Connor* (*David A. Nakashima* with him on the brief; *Hoddick, Reinwald, O'Connor & Marrack,* of counsel) for plaintiff-appellee.