WAYSON CHOW, Plaintiff-Appellant, *v.* PAUL ALSTON, KATHLEEN DASHIELL, LEGAL AID SOCIETY OF HAWAII, a Hawaii non-profit corporation, and ANTHONY P. LOCRICCHIO, Defendants-Appellees

NO. 7508

CIVIL NO. 49802

OCTOBER 2, 1981

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY HAYASHI, C.J.

Plaintiff-Appellant Wayson Chow (Chow) appeals from the summary judgment entered against him in an action brought

against Paul Alston (Alston), Kathleen Dashiell (Dashiell), the Legal Aid Society of Hawaii (LASH), and its then executive director Anthony P. Locricchio (Locricchio).

The issues presented for review are 1) whether the summary judgment was appropriately granted in a libel action where the defendant established the existence of a qualified privilege, and 2) whether plaintiff had established a cause in intentional interference with a contractual right in the absence of a showing that the statements made were intended and done with malice. For the following reasons, we affirm the summary judgment.

Just prior to graduating from the University of Southern California Law Center in 1975, Chow was awarded a fellowship by the Reginald Heber Smith Community Lawyer Fellowship Program. The "Reggie" Program (as called by the program participants) is federally funded and administered by the Howard University School of Law in Washington, D.C., to provide legal assistance to low-income communities through various organizations around the country. Chow's contract with the "Reggie" Program provided that he would be assigned to LASH for an initial term of one year at a set salary to be paid with funds supplied LASH by the "Reggie" Program in Washington, D.C. The contract provided, *inter alia,* that Chow would be subject to the immediate supervision and control of the LASH director and would be called upon to help alleviate the caseload. The agreement was signed by Chow and Glenn E. Carr, Executive Director of the "Reggie" Program. LASH did not have a written contract with the "Reggie" Program.

Chow was assigned to the housing unit at LASH and was involved in legal matters concerning Honolulu's Chinatown residents. The supervising attorney for the housing unit was Kathleen Dashiell. Chow and Dashiell experienced some difficulty in reaching an agreeable working situation and relations between them became quite strained, prompting Dashiell, on May 6, 1975, to draft a memorandum to Paul Alston (her immediate superior and director of litigation) detailing the difficulties:

This will inform you that as of May 10, 1976, I am unable to accept any professional or supervisional responsibility for Wayson Chow. I indicate this to you in the hopes that it will open dialogue that may resolve the situation.

For 8 months Wayson and I have grappled with the problem

of our supervisor/lawyer relationship. I experience virtually no change in the problems that existed 8 months before except that I think Wayson now also believes there are some problems.

At this point, Wayson has one potentially significant case, about 6 inconsequential cases mainly handed [sic] by a para, and 3 or 4 divorces. I do not feel it is ethically responsible for me to give him any more work. He will not tell me what is going on, if he does tell me something is happening in a case he will not (or can not) frame the issue and problem so that I can give a useful response. He has no initiative and very little follow through. I have repeatedly emphasized the kinds of communicating I think he needs to do and he still won't (or can't) do it.

At one point it was suggested that I meet daily with Wayson to go over what he is doing. This might work but I do not feel that I can do this, and do my legal work, supervise Bob Harris and two para's and provide the hour or so a day of back-up that I give to other attorneys and staff. I also tried this in a fashion but Wayson's inability to formulate his problems rendered it meaningless.

I'm aware these are all my problems to some extent but I feel the situation must be confronted. It is not fair to the Housing Unit and its client priority to consider it staffed by 3 lawyers. It is not staffed by 3 lawyers.

I have worked with several of the new lawyers in this office and have experienced none of these problems. I do not believe the situation is a product solely of Wayson's "newness."

.    .    .    .

Chow continued to work in the housing unit throughout the summer of 1976, and Dashiell continued as his supervisor until she became ill. In her absence, Chow was supervised by Alston with apparently the same results. In an attempt to alleviate the difficulties, in late July or early August 1976, Alston informed Chow of the decision to transfer him to the family law unit. After several days, Chow advised Alston that he would not accept the transfer and would resign or be discharged effective November 1, 1976.

Prior to this time, in the early summer of 1976, Chow had informed the Smith Fellowship Program of his desire to renew his contract. He subsequently received a second-year contract from the Smith Fellowship Program for the period August 1, 1976, through

July 31, 1977. LASH, by letter of October 21, 1976, to the Smith Fellowship Program, acknowledged the second-year contract.

On October 28, 1976, Alston sent a memorandum to Chow recapping the events of the previous months, the alternatives made available to him, and mentioning his apparent decision to resign effective November 1. This suit was filed the same day. A discharge letter was then given Chow to the effect that his employment was terminated November 1, 1976.

Chow's complaint alleged that he was defamed by the May 6, 1976, Dashiell memo and the October 28, 1976, Alston memo,[1] and that the actions of the defendants in effecting his exit from LASH constituted intentional interference with his contract under the "Reggie" Program. On December 12, 1978, Chow filed a motion for a partial summary judgment on the issue of liability against Dashiell and LASH. On January 29, 1979, Alston, Dashiell, and LASH filed a cross-motion for summary judgment. The appellees argued that the statements made were either qualifiedly privileged or not defamatory at all. On June 13, 1979, the court entered an order granting appellees' cross-motion for summary judgment.[2]

In this appeal, Chow contends that the appellees' claim of qualified privilege raised factual questions that precluded the court from granting summary judgment. He argues that Dashiell acted unreasonably in having a secretary from another department type and publish the memorandum of May 6, 1975.[3] We disagree.

---

[1] At oral argument appellant's counsel stated that Locricchio was no longer required as a defendant and that Alston was a defendant *only* with respect to the claim for intentional interference.

[2] The record does not contain the court's findings or the hearing transcripts and thus we are not entirely clear on which theory the trial judge utilized.

[3] Chow also argued that Dashiell committed slander, *per se,* when some two months later she orally commented to a paralegal that he was the "worst attorney" she had ever seen. However, this separate cause of action was not raised in the pleadings, nor does the record show that the pleadings were amended to allege this claim. In determining whether defamation is actionable *per se* without the pleading and proof of special damages, a distinction is drawn by many courts between written and spoken words so that when spoken, it is not actionable without an averment of extrinsic facts or an allegation and proof of special damages and is when written or printed. The courts base the distinction upon an alleged difference in the inherent characteristics of the two classes of imputations, it being said that the presumption that words are defamatory arises much more readily in cases of libel than slander. *See* 50 AM. JUR.2d *Libel & Slander* § 12 (1970).

The settled law in Hawaii is that it is libelous to state in writing that a member of any of the professions lacks the technical knowledge necessary for the proper practice of such profession or that he has been guilty of professional misconduct, and if a writing is found to be libel, *per se,* damages to the injured party need not be shown. *Murphy v. Maui Publishing Co.,* 23 Haw. 804 (1917). However, on review of the record before us, we cannot conclude that Dashiell's memorandum to her superior detailing her difficulties in supervising appellant and her beliefs as to why she was experiencing difficulty rose to the level of being libel,*per se.* Moreover, even if we were to find that the memorandum is libelous, *per se,* this, alone, is not determinative of the issue of liability for even libel*per se* is subject to the publisher's defense of qualified privilege. *Russell v. American Guild of Variety Artists,* 53 Haw. 456, 497 P.2d 40 (1972).[4] A qualifiedly privileged occasion arises when the author of the defamatory statement reasonably acts in the discharge of some public or private duty, legal, moral, or social, and where the publication concerns subject matter in which the author has an interest and the recipients of the publication a corresponding interest or duty. *Aku v. Lewis,* 52 Haw. 366, 477 P.2d 162 (1970); *Russell v. American Guild of Variety Artists, supra; Lauer v. YMCA,* 57 Haw. 390, 557 P.2d 1334 (1976); *Hamm v. Merrick,* 61 Haw. 470, 605 P.2d 499 (1980). *See also Pierson v. Robert Griffin Investigations,* 92 Nev. 605, 555 P.2d 843 (1976); *Scarpelli v. Jones,* 229 Kan. 210, 626 P.2d 785 (1981). We hold that the defense of qualified privilege is applicable to the Dashiell memorandum. Therefore, summary judgment was properly granted by the trial court. *Giuliani v. Chuck,* 1 Haw. App. 379, 620 P.2d 733 (1980); *Ottensmeyer v. Baskin,* 2 Haw. App. 86, 625 P.2d 1069 (1981).

In order to establish a cause of action against a third party for intentional interference with a contractual right, it must be shown that the third party acted with intent and legal malice, i.e., "the intentional doing of a harmful act without legal or social justification or excuse, or, in other words, the wilful violation of a known right." 45 AM. JUR.2d, *Interference* § 3 (1969). We have carefully reviewed the facts in the record and conclude that there is no genuine issue of material fact; and there is no basis for this claim as a matter of law.

---

[4] For a discussion of the law of defamation in Hawaii, *see generally, Defamation: A Study in Hawaii Law,* 1 Univ. of Hawaii L. Rev. 84 (1979).

Accordingly, the judgment is affirmed.

*Clayton C. Ikei* for plaintiff-appellant.

*Stephen D. Whittaker (Chester A. Richardson,* on the brief), *Case, Kay and Lynch,* of counsel, for defendants-appellees.